In the

# United States Court of Appeals

## For the Seventh Circuit

No. 07-3287

JORGE NEGRETE,

*Plaintiff-Appellant,*

*v.*

NATIONAL RAILROAD PASSENGER
CORPORATION (Amtrak),

*Defendant-Appellee.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 08 C 873—**Joan B. Gottschall**, *Judge.*

ARGUED APRIL 10, 2008—DECIDED OCTOBER 27, 2008

Before EASTERBROOK, *Chief Judge*, and ROVNER and
SYKES, *Circuit Judges*.

SYKES, *Circuit Judge*.    Jorge Negrete, a former track-
repair worker for Amtrak, hurt his back when he fell off
a welding truck. He sued Amtrak, alleging that the
injury had left him permanently disabled and unable to
work. The district court, however, dismissed his case
after determining that Negrete had intentionally flouted
discovery deadlines, hidden and tampered with evidence,
and lied in his deposition. We affirm, and because it

appears that Negrete may have committed perjury, we refer this opinion to the United States Attorney.

Negrete's litigation conduct in this case can only be described as appalling. The problems began when Amtrak tried to investigate the allegations in Negrete's lawsuit. Understandably, it sought to answer two questions: how badly Negrete was injured, and whether he was still able to work. To shed light on the first question, it asked Negrete for the name of each doctor who had seen him for his injury. Negrete provided only the names of the doctors whose findings helped his case, withholding the names of two who had concluded that he was not permanently injured and was able to work. He also neglected to mention the name of a third doctor, who had performed an MRI on him.

With the exception of the MRI, which Amtrak was unable to locate for almost a year, Amtrak wasn't prejudiced by Negrete's deceit; it already knew about all but one of the undisclosed doctors. But because Negrete's incomplete answers left the impression that it wasn't getting the whole story, Amtrak tried to obtain copies of the medical records kept by the Railroad Retirement Board ("RRB"). Once again the investigation was thwarted. Amtrak requested a copy of the file from Negrete (the RRB will only disclose medical records to a patient), who responded by delivering 12 pages. Amtrak couldn't believe that the 12 pages were a complete record, so it moved to compel production, after which Negrete eventually turned over 236 pages. These included a never-before-disclosed report by an RRB

physician, who disagreed with a prior doctor's conclusion that Negrete couldn't work. Strangely, however, the supposedly complete 236-page file did not contain the 12 pages Negrete had originally produced. Tired of these shenanigans, the court ordered Negrete to obtain a sealed copy of his RRB file and to submit that file, unopened, for inspection. He eventually turned over an envelope purporting to be the file, but the envelope had been opened—twice—leaving the court to speculate that he had once again tampered with the file.

In addition to investigating the seriousness of Negrete's injury, Amtrak also tried to assess whether Negrete was still able to work, inquiring about all the sources of Negrete's postaccident income. Once again it was thwarted. At a deposition Negrete initially testified that he had no income apart from the money he received from Amtrak. When asked specifically whether he owned any property, however, he admitted owning one apartment building with two tenants, each of whom paid him $450 per month, but stated that he did not own any other buildings. Both of these responses turned out to be false. Negrete's 2002 through 2005 tax returns revealed that he had at least $160,000 in income from *three* apartment buildings. And his rental receipt booklets—whose existence he initially denied—indicated that he received not $450 per month but $650 per month from his rentals. (Adding to the impression that Negrete was hiding income were a number of loan applications on which Negrete claimed to receive not $450 per month but $800 or even $1,000 per month from each tenant!) Worse still, Amtrak later discovered that Negrete had not

two tenants, as he originally testified, not six tenants as he later claimed, but *fifteen* tenants.

So the district court found that Negrete was trying to hide his rental income, which was relevant to his case because he claimed to be unable to earn a living because of his injury. But it also appears that Negrete may have been trying to hide the rental income for a second reason. Although Negrete testified at his deposition that he was unable to do even minor housework, his tenants told an Amtrak investigator that since the accident Negrete had personally painted, changed windows, repaired a floor, laid tile, and installed a new toilet. We may never know for sure whether that was true: Negrete seeks to explain the discrepancy by claiming that the tenants confused him with his sons, whom he claims to have paid to work on the apartments, and the district court did not make a specific finding on the issue. What is clear, however, is that Negrete was less than forthcoming about who actually performed the maintenance on his apartments. At his deposition he first indicated that his brother maintained the apartments in exchange for beer. And in response to a later interrogatory requesting a list of each person who had been paid to do maintenance on his apartments, Negrete disclosed only his sons. When his sons were deposed, however, they denied ever having been paid to do maintenance (they claimed to have helped their father for free) and testified that their father had hired contractors to do the large maintenance projects on the apartment. Negrete then admitted to hiring a dry-wall contractor and promised to provide his contact information but later claimed not to have it.

Relying on these prevarications and others (the district court noted, for example, that Negrete missed 21 discovery deadlines—in one case, verifying his interrogatory responses more than one year late), the district court dismissed the lawsuit under Rule 37(b)(2)(A)(v) of the *Federal Rules of Civil Procedure*, which authorizes dismissal as sanction for discovery violations. Dismissal is a drastic penalty, but it was no abuse of discretion to dismiss this case given Negrete's repeated, willful efforts to hide evidence. *See Wade v. Soo Line R.R. Corp.*, 500 F.3d 559, 564 (7th Cir. 2007); *Maynard v. Nygren*, 332 F.3d 462, 467 (7th Cir. 2003).[1] Negrete argues that his mistakes were innocent, but we will overturn factual determinations only if they are clearly erroneous, a standard not met here. True, Negrete often produced documents directly contradicting his deposition testimony, but that does not prove, as his lawyer claims, that his false testimony was inadvertent; it shows only that Negrete is a poor liar. Given Negrete's repeated misconduct, it would have been hard to reach any conclusion other than that he was acting in bad faith.

Negrete also argues that the sanction of dismissal was too harsh because he is uneducated and lied only about collateral issues. But Negrete's misconduct related to the

---

[1] In *Maynard*, we held that dismissal was appropriate only if there is clear and convincing evidence of willfulness, bad faith or fault, but we have subsequently suggested that the preponderance-of-the-evidence standard is more appropriate. *See Wade*, 500 F.3d at 564. There is no need to resolve the standard here because the evidence was clear and convincing.

most important issues of the case—how badly he was injured and whether he was able to work. And although Negrete may not be well educated, it does not take a graduate degree to understand that it is unacceptable to hide evidence and lie in a deposition. The district court's analysis was thorough; dismissal was an appropriate sanction.

AFFIRMED.